**INGLEWOOD WAREHOUSE LIQUORS, Plaintiff-Appellant,**

v.

**TENNESSEE ALCOHOLIC BEVERAGE COMMISSION, Defendant-Appellee.**

Court of Appeals of Tennessee, Middle Section, at Nashville.

March 8, 1985.

Application for Permission to Appeal Denied June 10, 1985.

James R. Omer, Nashville, for plaintiff-appellant.

W.J. Michael Cody, Atty. Gen. and Reporter, Ann Lacy Johns, Asst. Atty. Gen., Nashville, for defendant-appellee.

## OPINION

LEWIS, Judge.

On November 6, 1981, the Director of the Tennessee Alcoholic Beverage Commission (Commission) notified the petitioner Inglewood Warehouse Liquors (Inglewood) that a hearing would be held to determine if Inglewood's retail liquor license should be revoked. The grounds for the proposed revocation were set forth in the letter from the Commission.

On December 18, 1981, and January 8, 1982, a revocation hearing was had before William N. Bates, an Administrative Law Judge (ALJ). On August 20, 1982, the ALJ filed his findings of fact, conclusions of law, and order revoking Inglewood's retail liquor license. The findings of fact and order was adopted by the Commission as its own on October 7, 1982.

Inglewood then petitioned the Chancery Court for Davidson County, Tennessee, to review the Commission's final order. The Chancellor, pursuant to the Uniform Administrative Procedures Act, Tenn.Code Ann. § 4–5–101, et seq., reviewed the Commission's decision and, thereafter, filed a Memorandum in which he held that the decision of the Commission should be affirmed. On May 25, 1984, the Chancellor entered an order which incorporated the Memorandum Opinion affirming the decision of the Commission.

Our review of the record shows that the findings of fact and order of the ALJ, which were approved and entered as the order of the Commission, are supported by substantial and material evidence. Following in pertinent part are the findings of fact of the ALJ which were adopted by the Commission and concurred in by the Chancellor:

2. Inglewood is the holder of Tennessee Retailer's License to Sell Alcoholic Beverages Permit # 885. The application by Mark Buren Nicholson was approved for a retail liquor license by the ABC on April 23, 1982. Dottie Townes and Emily Townes later were approved by the ABC as part owners of Inglewood.

3. The records of the ABC reflect that Dottie Townes, Emily Townes, and Mark Buren Nicholson are the owners of Inglewood.

4. Application forms were submitted to the ABC by the owners of Inglewood on December 1, 1976, December 3, 1978, November 11, 1978, and December 23, 1979. Each form was signed by each Dottie Townes, Emily Townes, and Mark Van Buren. Each application contained question number 14 which reads, "Give the name and addresses of all persons other than those shown on application who share in the profits from your business and state their interest." Each time the question was answered, "None."

5. When the above applications were signed Dottie Townes, Emily Townes, and Mark Van Buren each knew the answer "None" to question 14 was false, and that Charles S. Rollins had a hidden interest in Inglewood.

6. S.J. King was the chairman of the ABC before January, 1976 and served in such capacity through December, 1978.

7. Robert E. Townes is the husband of Dottie Townes. Sometime in the early part of 1976, probably February, March, or April, Robert E. Townes met with one James Allen to discuss the application of Dottie Townes, Emily Townes and Mark Buren Nicholson for a retail liquor license. Allen advised Robert E. Townes the only way the approval of the applica-

tion could be assured was if the applicants agreed to take on as a partner the person to be designated by Allen. Allen mentioned the name S.J. King as a potential partner, and Robert E. Townes agreed King would be acceptable to Townes. Robert Townes then told Allen that he would have to discuss the matter with his partners, meaning his brother (the husband of Emily Townes) and Mark Buren Nicholson. Robert E. Townes did later discuss this with his brother.

8. Robert E. Townes met with S.J. King about a week or ten days later at the Continental Inn (owned by the Townes family) ... Robert E. Townes approached King about King becoming a partner in the liquor store. King stated he could not be a partner in the liquor store. King stated he could not be a partner since he was chairman of the ABC and that would be illegal. Sometime later King and Robert E. Townes agreed on Charles S. Rollins to be a partner as King's designee. Robert E. Townes testified he later talked to Dottie Townes, Emily Townes and her husband concerning this arrangement, and Emily Townes and Dottie Townes signed contracts transferring 25% interest in the liquor store to Charles S. Rollins. Robert E. Townes admitted he prepared one of these contracts.

9. As a result of the arrangement between King and Robert Townes, Charles E. Rollins, who later became King's son-in-law, received a share of the profits equal to that of Dottie Townes, Emily Townes, and Mark Nicholson for four years. For the year 1977, Rollins received $18,499.84. For the year 1978, Rollins received $21,165.12. For the year 1979, Rollins received $15,983.79. For the year 1980, Rollins received $26,483.04. The total profits for the four years was $82,131.79 received by Rollins (the same as Dottie Townes, Emily Townes, and Mark Buren Nicholson each received).

10. All of the agreements, payments, and contracts between Inglewood's other owners and Rollins were handled either by one of the owners giving the instrument to Robert Townes who in turn normally would give the instrument to S.J. King, who in turn would furnish the contract, paper, or check to Rollins.

11. Charles S. Rollins never met Mark Buren Nicholson, Dottie Townes, and Emily Townes before he became a hidden owner in Inglewood. Rollins never contributed anything for his interest, either by financial means or by working in the liquor store, and never met or contacted Nicholson, Emily Townes or Dottie Townes concerning the operation of Inglewood.

12. Robert E. Townes was acting as the agent for owners Dottie Townes and Emily Townes during his discussions and agreements with King and Allen.

13. Mark Buren Nicholson has been involved in the retail liquor business since 1939 and has held four (4) different licenses since that date for retail liquor licenses in Tennessee.

14. Robert E. Townes advised Nicholson of the ownership interest of Rollins sometime after Inglewood opened for business, possibly in 1977.

15. Nicholson made the original agreement to enter a business partnership with Dottie Townes and Emily Townes in 1976 through their husbands, Robert Townes and Ronnie Townes.

16. S.J. King testified he was involved in a meeting with Nicholson, and others regarding who would be the designee of King and receive part of the profits of Inglewood. This was denied by Nicholson.

17. Nicholson always signed the Inglewood checks made payable to Rollins, and always furnished such check to Dottie Townes, who in turn furnished the check to Robert Townes, who in turn furnished the checks to S.J. King, who in turn furnished the checks to Rollins.

18. Charles S. Rollins, while holding an interest in Inglewood, never applied to Metro Nashville for a Certificate of Good Moral Character.

19. Charles S. Rollins received profits from Inglewood for the calendar years 1977–1978 as the designee of S.J. King, during the period while King was chairman of the ABC.

20. Income tax returns for Inglewood were prepared showing Rollins holding a partnership interest for 1977–78–79–80 at the direction of Mark Buren Nicholson.

21. When Emily Townes transferred an interest in Inglewood to Rollins, she signed a blank sheet of paper given to her by Robert Townes and Ronnie Townes. At the time she did not know who would receive the ownership interest, and did so at the request of Robert Townes and Ronnie Townes. She never met Rollins before this hearing.

22. Robert E. Townes and S.J. King each were convicted of a felony in U.S. District Court, Middle District of Tennessee, Nashville Division, wherein each admitted being involved in a scheme and artifice to defraud Tennessee and its citizens from having the business of the ABC from being conducted honestly, impartially, free from deceit, craft, trickery, corruption, fraud, undue influence, dishonesty, conflict of interest and bribery in conjunction with having the retail liquor license of Inglewood approved by the ABC.

Inglewood first argues that Robert Townes did not do S.J. King a "favor" under Tenn.Code Ann. § 57–1–109(a) because King received nothing of value from Townes.

Tennessee Code Ann. § 57–1–109(a) provides as follows:

*Commissioners prohibited from accepting gifts or bribes—Conspiracy—Penalty.*—(a) No member of the commission and no person employed by the commission shall accept any gift, favor, merchandise, donation, contribution, or any article or thing of value, from any person, firm or corporation licensed under the provisions of this chapter.

Tennessee Code Ann. § 57–1–110 provides as follows:

*Offering gifts or bribes to commissioners—Penalty.*—When any distillery, wholesaler or retailer licensed under this chapter, or any person employed by any such distillery, wholesaler or retailer violates, or conspires with any other person to violate the provisions of § 57–1–109, or attempts to violate the provisions of § 57–1–109, it shall be the mandatory duty of the commission to revoke such person's license and permit.

Inglewood admits that if the Commission's finding that King, a former member and chairman of the Commission, accepted a "favor" from Inglewood, then pursuant to Tenn.Code Ann. § 57–1–110 the Commission was mandated to revoke Inglewood's liquor license.

Inglewood contends that "a 'favor' under Section 57–1–109(a) must be a service of pecuniary value to the recipient" and that "to the extent that Robert Townes did S.J. King any service, it had no pecuniary value to King, and hence was not a favor."

█ The record shows that King was given the right to designate his friend and business associate, Rollins, as the recipient of a twenty-five (25%) percent interest in Inglewood Liquors. Rollins was designated to receive that twenty-five (25%) percent interest as a gift. The right to designate the recipient of a valuable financial benefit under the circumstances of this case constitutes a favor pursuant to Tenn.Code Ann. § 57–1–109(a).

King's friend and business associate, who later became his son-in-law, received some $85,000 from the profits of Inglewood.

"Favor" is not defined in Tenn.Code Ann. § 57–1–101, *et seq.* However, *Black's Law Dictionary* (5th ed.) p. 548 defines "favor" as "An act of kindness or generosity, as distinguished from one that is inspired by regard for justice, duty, or right. Friendly regard shown toward another. Bias; partiality, leniency; prejudice."

The term "favor" does not suggest either in its everyday use or in the definition set forth in *Black's* that a direct material

benefit must be conveyed to its recipient. King's right to designate Rollins, his friend, business associate, and son-in-law as the recipient of an $85,000.00 gift constitutes a favor as contemplated by the statute.

There is ample evidence in this record to support King's right to designate Rollins as the recipient of a financial gift a "favor." Jim Allen informed Robert Townes in the spring of 1976 that he would like to help Townes get a liquor license but that there were several people who had worked in the Blanton campaign who had to be taken care of. Allen suggested and/or informed Townes that he should take a silent partner and mentioned King's name as a possible silent partner.

Townes discussed the matter with King and told him that it had been suggested that he take King as a partner in the liquor store. King informed Townes that he couldn't become a partner because he was chairman of the Commission. Townes then asked King if he knew of "anybody else you want to do something with." Some weeks later Townes and King met again and King told Townes: "I think I may have somebody I'd like to have as a partner in your wife's store." King testified that he told Townes that he couldn't accept a one-fourth interest in the liquor store because he was a member of the Commission "but I could recommend a friend, if it is time to take care of friends, you know." King then recommended Charles S. Rollins, who was accepted as a partner in Inglewood Liquors.

The record overwhelmingly shows the parties' intention to convey a "favor" to King by allowing him to designate someone as the recipient of one-fourth of Inglewood's profits. The record shows that prior to King's contacting Rollins and proposing that he become a partner in the liquor store, they were friends and that King had assisted Rollins in Rollins' purchase of a tire store. The record shows that in June of 1978 Rollins married King's daughter. The record shows that the partners in Inglewood Liquors routinely gave Rollins' partnership checks to King, who delivered them to Rollins, and as pointed out by the Commission "making certain that King was aware of the ongoing payments to Rollins."

This issue is without merit.

Inglewood, by its second issue, contends that the acts of Robert Townes cannot be imputed to Inglewood because Townes was not Inglewood's agent, nor did Inglewood enter into a conspiracy with him.

By this issue Inglewood challenges the finding of fact that Robert Townes acted as agent for his wife, Dottie, and his sister-in-law, Emily Townes, in discussing with Jim Allen and King the advisability of taking King and/or King's designee as a twenty-five (25%) percent silent partner.

While we are of the opinion that the evidence amply supports the finding that Townes was Inglewood's agent, a reading of the Commission's order shows that the Commission revoked the license, not on the theory of agency, but because the licensees were co-conspirators and actively joined in the conspiracy. Such a conspiracy constitutes a statutory violation and mandates the revocation of the license.

 Insofar as the conspiracy of Dottie Townes and Emily Townes is concerned, the ALJ found:

At the time S.J. King named Charles S. Rollins there existed a criminal conspiracy between Robert Townes, S.J. King, and possibly Jim Allen and Mark Buren Nicholson. Thereafter, Robert Townes checked out the name of Charles Rollins with his brother and his brother's wife, Emily Townes, and his wife, Dottie Townes. At this point these individuals joined in the ongoing criminal conspiracy to offer a "favor" to S.J. King by accepting Charles Rollins as a silent partner who was to be paid 25% of the profits of the liquor store.

As to Mark Nicholson, the hearing officer found:

Even if Nicholson was not part of the initial agreement to accept Charles Rollins, as testified to by S.J. King, he later learned of and actively conspired and vio-

lated section 57–1–109–110 by signing checks for Rollins with the full knowledge that this was a "political payoff" and "favor" to S.J. King.

There is substantial and material evidence in the record to support the hearing officer's finding of a criminal conspiracy.

The record shows that the licensees actively participated in an unlawful conspiracy. Dottie and Emily Townes executed the papers to make Rollins a partner. Dottie Townes delivered the checks to her husband for delivery to Rollins. Nicholson signed the checks. Nicholson also met with King, Robert Townes and his brother in an effort to select a suitable silent partner. Nicholson submitted the renewal applications which did not disclose Rollins' interest.

The Commission was mandated pursuant to Tenn.Code Ann. § 57–1–110 to revoke the license.

Since Inglewood's license was revoked solely and alone on the basis of a violation of Tenn.Code Ann. § 57–1–110, we pretermit Inglewood's issue concerning certain technical violations.

The judgment of the Chancellor in affirming the decision of the Commission is affirmed with costs assessed against Inglewood and the cause remanded to the Chancery Court for the collection of costs and any further necessary proceedings.

TODD, P.J. (M.S.), and CANTRELL, J., concur.